UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| DENISE MOBERLY, | ) | CIV. 08-4120-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER GRANTING IN PART |
| | ) | AND DENYING IN PART |
| MIDCONTINENT COMMUNICATION, | ) | DEFENDANT'S MOTION FOR |
| | ) | SUMMARY JUDGMENT |
| Defendant. | ) | |

Defendant, Midcontinent Communication (Midcontinent), moves for
summary judgment on plaintiff, Denise Moberly's, claims of sexual harassment
and retaliation under Title VII. Moberly opposes the motion. The motion is
granted in part and denied in part.

**BACKGROUND**

Viewed in the light most favorable to Moberly, the nonmoving party, the
facts are as follows: Moberly was hired in April 2006 to be a Regional Sales
Supervisor (RSS) for Midcontinent. The RSS position was new to Midcontinent.
As an RSS, Moberly's duties included managing a team of account executives,
some of whom sold cable television advertising and others of whom sold
Business Solutions. Moberly was hired to be the RSS for Midcontinent's Sioux
Falls office. During Moberly's interview, there was a specific discussion
regarding the challenges of the team Moberly would manage. Midcontinent
was aware that there were specific personality challenges on the team. Moberly

understood that she would be overseeing a group of salespersons and that one of the challenges of her job would be dealing with different personalities.

Moberly's direct supervisor was Shawn Carolan, a general sales manager. From April 2006 to September 2006, Carolan reported to Dennis Kautz, who in turn reported to Mark Powell, the director of sales. In September 2006, Kautz was removed from the reporting chain so that Carolan reported directly to Powell. Both Carolan and Powell oversaw Moberly's work. Due to the newness of the RSS position, Carolan spent a lot of time training the new RSSes in other offices. While Carolan was out of the office, Kautz and Powell provided assistance and direction for Moberly in the Sioux Falls office.

Moberly received Midcontinent's employee handbook on her first day on the job. She was given a second copy of the employee handbook in January 2007. As a supervisor, Moberly had access to all of Midcontinent's policies, procedures, and handbooks. The employee handbook contained Midcontinent's sexual harassment policy. This policy states that an employee who has a complaint of discrimination, harassment, or inappropriate or offensive conduct by anyone, "must promptly bring the problem to the attention of [her] Supervisor, Department Head or one of" three specified persons at Midcontinent, including Debbie Stang, the director of employee services and the primary human resources contact for Midcontinent's Sioux Falls office. Docket 16, Ex. 8 at 4-5. The sexual harassment policy also

provides that if the complaint involves someone in the employee's direct line of command, then the employee must bring the complaint to one of the three specified persons. Further, the policy provides, "Midcontinent will not retaliate against any employee who makes a good faith report of discrimination, harassment, or inappropriate or offensive conduct, or assists in or cooperates in an ensuing investigation. Nor will Midcontinent permit any employees to retaliate." Id. at 5. The sexual harassment policy also sets out the procedure by which an employee who disagrees with the results of an investigation may seek review of the investigation. Moberly received the sexual harassment policy but did not read it. She did not consult the sexual harassment policy before reporting that she was sexually harassed.

A few months after Moberly began working at Midcontinent, she began having romantic encounters with Powell. In August 2006, Powell kissed Moberly twice after a work event in Sioux Falls. Moberly agrees that the kisses were mutual and that at the time, she suffered no distress and did not feel like she was being harassed. She did not report the kissing to anyone at Midcontinent at the time because she believed it was mutual. After the contact in August, Moberly continued to have a good working relationship with Powell.

Later in August 2006, while on a business trip in Bismark, North Dakota, Powell touched Moberly's leg and invited her to his hotel room. They spent the night together in Powell's room. Moberly went to Powell's room

because they had a mutual attraction. She was not forced to go and she did not go because Powell was her supervisor. At the time, Moberly did not feel that Powell's conduct constituted sexual harassment. Moberly did not report the events in Bismark to anyone at Midcontinent because she believed the contact was mutual.

No physical contact of a romantic nature occurred between Moberly and Powell from August 2006 to November 2006. During this time, Powell told Moberly that he found her attractive and flirted with her. Moberly admits that the attraction and flirting were mutual.

In November 2006, during a work-related trip to Minneapolis, Minnesota, Powell went to Moberly's hotel room. Moberly claims that Powell called her room, but admits that she invited him to her room. Moberly ordered two beers from room service at some point before Powell arrived at her room. No physical or sexual contact happened between Powell and Moberly, but they did discuss the nature and duration of their romantic relationship. Moberly told Powell that their mutual attraction could not go anywhere because Powell was not going to leave his wife and children. Moberly admits that until this conversation, the attraction between herself and Powell was mutual. At some point after this conversation, Moberly began to believe that all of her previous romantic contact with Powell was sexual harassment because of Powell's position as a supervisor.

After the conversation in Minneapolis, Moberly and Powell did not engage in any sexual touching.  In December 2006, Powell made multiple comments to Moberly about being attracted to her and two comments that he wished he could spend the day in her office.  Moberly does not recall Powell making any similar comments in January 2007.  She does not know how many times Powell made comments of this type because she did not keep a diary of his statements.  Moberly claims that these comments made her uncomfortable and created tension between her and Powell.  She told Powell one or two times that his comment that he was attracted to her made her feel uncomfortable.  She did not contact anyone at Midcontinent about Powell's comments.  Moberly testified that these comments were the only conduct by Powell that made her uncomfortable in the post-November 2006 time period.  There is no evidence that anyone at Midcontinent, including Carolan and Stang, was aware of Moberly's personal relationship with Powell.

Meanwhile, Moberly had issues managing her team of account executives.  In late October or early November 2006, before Moberly and Powell's conversation in Minneapolis, Moberly reported to Powell that her team members were complaining about a rumored relationship between Carolan and Leigh Jerzak, an account executive on Moberly's team.  Moberly told Powell that the way Carolan treated Jerzak was causing contention on Moberly's team. Moberly claimed that accounts were handed to Jerzak.  Moberly also explained

in her deposition that Carolan showed favoritism in his day-to-day interactions with Jerzak by telling her that she looked cute and had great shoes while not greeting the other employees. Moberly reported that she needed help with the situation.

The source of the rumor regarding Carolan's relationship with Jerzak is unclear. Moberly claims that Julie Van Overschelde, an account executive, had shared with the rest of the team that she believed Carolan and Jerzak were in a relationship based on what Van Overschelde saw at an off-site work social. No one told Moberly directly of the rumored relationship between Carolan and Jerzak; rather, Van Overschelde told the rest of the team, which created a morale problem. Van Overschelde later denied that she saw Carolan and Jerzak engaged in a personal relationship or told anyone at Midcontinent that she was uncomfortable about the behavior in which she had seen Carolan and Jerzak engage.

Moberly also claims that team members Annette Lewis, Cathy Mathison, Kim Burma, and Shanna Dirkson had information about the relationship between Carolan and Jerzak. There is no evidence in the record relating to Lewis or Mathison. Burma testified that Carolan and Jerzak had a social or personal relationship. She testified that she did not believe Jerzak got better treatment from Carolan, just different treatment. Burma testified that the rumor that Carolan and Jerzak kissed at a work function was disruptive to the

team.  Dirkson testified that she was aware of a rumor regarding Carolan and Jerzak, but did not think they were having an affair.  Dirkson knew that other employees had complained to Moberly about Carolan's workplace behavior with Jerzak.  Dirkson testified that Carolan and Jerzak's relationship was not a problem for her and that she did not think the rumor affected how the team worked together.  Dirkson testified that she was upset because Carolan reported to her that Moberly had claimed that it was Dirkson who had contacted Moberly about the rumor.  Dirkson denied calling Moberly and was upset that Carolan believed she had.  Moberly did not ask Jerzak about her relationship with Carolan.

After Moberly reported the rumor to Powell, Powell approached Carolan with the information about the rumor, and Carolan held one-on-one meetings with each member of Moberly's team on November 7, 2006, through November 9, 2006.  Stang was aware that Carolan would be conducting one-on-one meetings.  She did not conduct an investigation regarding the rumor of a romantic relationship between Carolan and Jerzak.  Moberly later told Stang that she felt good about the way Powell handled the situation and thought that it was prudent for Carolan to have one-on-one meetings.  During Moberly's one-on-one meeting with Carolan, she informed him that the problems she had managing her team were related to Carolan's relationship with Jerzak.

Burma and Dirkson both discussed the rumored affair in their meetings with Carolan.  After meeting with all of the members of Moberly's team, Carolan concluded that the rumored affair was not affecting the team.  He concluded that the "affair concern seemed to be solely a Denise Moberly perception." Docket 23, Ex. 7 at 2.

Moberly faced more difficulties with her team in the time after Carolan's one-on-one meetings and Moberly's hotel room conversation with Powell in Minneapolis.  On November 27, 2006, Jerzak sent an email to Stang and Carolan setting out certain complaints about Moberly.  Jerzak indicated that a client reported to Jerzak that Moberly had been rude to him on the telephone regarding the client's request to have Jerzak as an account executive.

On December 4, 2006, Carolan issued a written warning to Moberly instructing her that she was not permitted to display any type of favoritism when dealing with account executives on her team.  This was the first written warning Moberly received regarding her work performance.  Carolan had orally discussed some issues regarding Moberly's communication and supervision, but he did not document his concerns at the time.  Powell reviewed and approved of the written warning.  Moberly asserts that Powell had input into the warning.

Moberly admits that the facts set forth in the warning were accurate and admits that she engaged in unprofessional conduct by displaying favoritism

toward a particular account executive when dealing with one of Midcontinent's customers. But Moberly claims that the situation was escalated by Powell telling Carolan that Moberly had complained about Carolan's rumored relationship with Jerzak. Midcontinent denies that Carolan issued the warning because Moberly complained about his rumored relationship and further denies that Carolan was angry at Moberly. Rather, Midcontinent asserts that Carolan was angry at Dirkson, who he believed started the rumor of the affair.

On or about December 19, 2006, Carolan issued Moberly's annual performance evaluation. Carolan's review of Moberly's performance was negative. Carolan indicated that Moberly had personality conflicts with management, peers, subordinates, and customers. Carolan also indicated that Moberly had not treated all of the members of her team with equality and fairness, creating a perception of favoritism. Moberly's performance evaluation also stated that she was to attend a minimum of one appointment per week with each account executive and that she was to provide a weekly report of the appointments she attended. Moberly was not timely in providing these reports to Carolan. The performance evaluation also stated that Moberly was to complete tasks and meet deadlines as established by management. She was not timely on these goals. Under Midcontinent policy, if an employee believes her review is unfair or inaccurate, she may file a grievance with Stang within

five days of reviewing the evaluation with her supervisor. Moberly did not file a grievance regarding her performance evaluation.

Carolan drafted Moberly's performance evaluation, and Powell reviewed and approved it. Powell did not recommend any substantive changes to the evaluation. The evaluation was what Powell expected. Carolan testified that the evaluation was based on his own personal observations and conclusions as Moberly's direct supervisor. There is no evidence that Carolan knew about Moberly's relationship with Powell or that Moberly was having difficulty in her relationship with Powell when Carolan prepared the evaluation.

In early February 2007, Carolan told Moberly that he had seen an improvement in her attitude and stress level, but that this did not change the way things were going regarding her performance. Moberly believed that Carolan thought her performance had improved and that she was off the disciplinary warning at this time. Carolan did not document this meeting.

In mid-February 2007, Carolan informed Moberly that she would not receive a bonus. Carolan told Moberly that he had about "fallen off his chair" when Powell told him that Moberly would not be getting a bonus. Powell told Moberly and Carolan that Moberly would not receive a bonus because of the written warning and performance issues. Under Midcontinent's bonus policy, employees with unsatisfactory performance reviews are not eligible for a bonus. Moberly was the first employee supervised by Carolan who had not received a

bonus.  She was also the first employee who had received a written warning or an unacceptable performance evaluation.  Moberly was upset that she would not be receiving a bonus and asked Powell if she could talk to Stang.

Later in February 2007, Carolan recommended to Powell and Stang that Moberly be terminated for lack of improvement in her performance.  Carolan had to obtain Powell's approval to terminate Moberly, and Powell gave his approval.  Moberly asserts that Powell had input into Carolan's recommendation.  It is undisputed that Powell drafted the termination form and did so in a way that surprised Carolan "a little bit."  Docket 23, Ex. 2 at 127.

Moberly was terminated on or about March 1, 2007.  The termination form indicates, "[b]ecause of continuous and ongoing challenges w/ management we are going in a different direction w/ the [Sioux Falls] RSS." Docket 23, Ex. 10.  The termination form lists several "termination reasons," but this portion of the form was not filled out.  Both Powell and Carolan signed the form.  Moberly stated that she disagreed with the decision to terminate her employment and explained, "[m]y strength as a person/woman was challenging for all of us.  My [tenacity] to do the right thing for my team & ultimately Midcontinent caused conflict.  I am deeply sorry that it did not work out."  Id.

Moberly acknowledges that Midcontinent may have had issues with her performance and her ability to take care of her job, meet deadlines, and handle

job responsibilities, but argues that her written warning, negative performance review, denial of a bonus, and termination were a result of sexual harassment and retaliation. On March 13, 2007, Richard D. Casey, an attorney retained to represent Moberly, wrote a letter to Stang alleging that Powell sexually harassed and retaliated against Moberly. Moberly skimmed the letter during her deposition and stated that she did not believe the letter was missing any information in regard to her claims against Midcontinent. Aside from Moberly's statements to Powell that his comments regarding her attractiveness made her uncomfortable, Casey's letter was the first notice Midcontinent received regarding Moberly's allegation that she had experienced inappropriate workplace conduct. Moberly did not report to anyone at Midcontinent that she believed she had been sexually harassed by Powell while she was still employed. After receiving Casey's letter, Stang conducted an investigation into Moberly's allegations of harassment and retaliation by Powell. Stang interviewed both Moberly and Powell during the course of her investigation. She concluded that the alleged conduct did not rise to the level of actionable workplace harassment. Moberly filed a charge of discrimination with the South Dakota Division of Human Rights on June 6, 2007, alleging sex discrimination and retaliation. She filed a complaint in this court on July 23, 2008.

## STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Only disputes over facts that might affect the outcome of the case under the governing substantive law will properly preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is not appropriate if a dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.

The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The nonmoving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record. Vette Co. v. Aetna Cas. & Sur. Co., 612 F.2d 1076, 1077 (8th Cir. 1980). The nonmoving party may not, however, merely rest upon allegations or denials in its pleadings, but must set forth specific facts by affidavits or otherwise showing that a genuine issue exists. Forrest v. Kraft Foods, Inc., 285 F.3d 688, 691 (8th Cir. 2002).

**DISCUSSION**

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against employees with respect to their compensation, terms, conditions, or privileges of employment, because of race, color, religion, sex, or national origin.  See 42 U.S.C. § 2000e-2(a)(1).  An employer is also prohibited from retaliating against an employee because the employee "opposed any practice made an unlawful employment practice by" the provisions of Title VII. 42 U.S.C. § 2000e-3(a).  Here, Moberly alleges that she was discriminated against on the basis of her sex as a result of sexual harassment and that she was unlawfully retaliated against for opposing sexual harassment in the workplace.

Both of Moberly's claims are evaluated under the McDonnell Douglas burden-shifting framework.  See Erenberg v. Methodist Hosp., 357 F.3d 787, 792-93 (8th Cir. 2004) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)).  Under this framework, in order to survive summary judgment the "plaintiff must first demonstrate a prima facie case of discrimination." Id. at 792.  If this initial burden is met by the plaintiff, "the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for its employment decision." Id.  Finally, if this burden is met by the employer, "the burden shifts back [to] the plaintiff to show the employer's stated reason was a mere pretext for discrimination." Id.  Despite the burden-shifting nature of the

McDonnell Douglas framework, the ultimate burden remains with the plaintiff to prove unlawful discrimination.  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507 (1993).

## I.    Sexual Harassment

Moberly claims that she was subjected to sexual harassment in violation of Title VII.  The Supreme Court has recognized two types of sexual harassment that may be actionable under Title VII: first, harassment linked to an economic quid pro quo, commonly called "quid pro quo" harassment, and second, harassment that creates an "intimidating, hostile, or offensive working environment," commonly called "hostile work environment" harassment. Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65 (1986).  "The principal significance of the distinction is to instruct that Title VII is violated by either explicit or constructive alterations in the terms or conditions of employment and to explain the latter must be severe or pervasive."  Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 752 (1998).  "When a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII."  Id. at 753-54.  But conduct that does not result in a tangible employment action must be severe or pervasive to be actionable.  Id.  Because Moberly suffered a tangible employment action, the court considers her sexual

harassment claim under the standards for both quid pro quo and hostile work

environment harassment.[1]

### A. Quid Pro Quo Sexual Harassment

"Sexual harassment is quid pro quo if a tangible employment action

follows the employee's refusals to submit to a supervisor's sexual demands."

Henthorn v. Capitol Commc'ns, Inc., 359 F.3d 1021, 1026-27 (8th Cir. 2004).

"A plaintiff in that situation need not prove that the offensive conduct is severe

or pervasive because any carried-out threat is itself deemed an actionable

change in the terms or conditions of employment." Id. at 1027. In order to

make a prima facie case of quid pro quo harassment, Moberly must prove:

---

[1] The court considers the quid pro quo theory of recovery even though Moberly did not explicitly set out this theory in her brief. The Supreme Court has said that the terms, "quid pro quo" and "hostile work environment" are of "limited utility." Ellerth, 524 U.S. at 751. Further, the Eighth Circuit has explained that "[b]oth quid pro quo and hostile work environment sexual harassment claims are grounded in the same legal theory under Title VII, the former involving an explicit, and the latter a constructive, change in conditions of employment." Henthorn v. Capitol Commc'ns, Inc., 359 F.3d 1021, 1026 (8th Cir. 2004). Although Moberly did not set forth the standard for quid pro quo sexual harassment, she did argue that she suffered "the ultimate adverse employment action when she was terminated." Plaintiff's Memorandum Brief in Opposition to Summary Judgment, Docket 20 at 10. Moberly's allegation that she suffered sexual harassment and an explicit change in the conditions of her employment at the hands of Powell sufficiently raises the issue of whether she was subjected to quid pro quo sexual harassment. Cf. Newton v. Cadwell Labs., 156 F.3d 880, 883 (8th Cir. 1998) (reversing and remanding for district court to consider whether plaintiff established hostile work environment sexual harassment where plaintiff incorrectly characterized her claim as a quid pro quo sexual harassment).

> (1) she was a member of a protected class; (2) she was subjected to unwelcome harassment in the form of sexual advances or requests for sexual favors; (3) the harassment was based on sex; and (4) her submission to the unwelcome advances was an express or implied condition for receiving job benefits or her refusal to submit resulted in a tangible job detriment.

Ogden v. Wax Works, Inc., 214 F.3d 999, 1006 n.8 (8th Cir. 2000) (citing Cram v. Lamson & Sessions Co., 49 F.3d 466, 473 (8th Cir. 1995)).  The first element, membership in a protected class, is satisfied by virtue of Moberly's status as a woman.  See Quick v. Donaldson Co., 90 F.3d 1372, 1377 (8th Cir. 1996).

With respect to the second element, that Moberly was subjected to unwelcome harassment in the form of sexual advances or requests for sexual favors, "the conduct at issue must be 'unwelcome' in that the plaintiff neither solicited it nor invited it and regarded the conduct as undesirable or offensive." Scusa v. Nestle U.S.A. Co., 181 F.3d 958, 966 (8th Cir. 1999).  "The proper inquiry is whether the plaintiff indicated by [her] conduct that the alleged harassment was unwelcome." Quick, 90 F.3d at 1378.

Here, Moberly admits that all of Powell's romantic and sexual advances were mutual before the November 2006 business trip to Minneapolis.  Thus, Powell's conduct and comments before this conversation cannot be considered unwelcome harassment even though they were sexual in nature.  See Stuart v. General Motors Corp., 217 F.3d 621, 632 (8th Cir. 2000) (holding that hostile work environment claim must fail where there is no evidence that plaintiff

considered herself subject to unwelcome harassment at the time).  As a result, the only potentially actionable conduct by Powell is his conduct after the Minneapolis trip in November 2006.

Taking the evidence in the light most favorable to Moberly, Powell made multiple comments about being attracted to Moberly and made two comments that he wished he could spend the entire day in her office during the month of December 2006.  Powell did not make any similar comments in January 2007. Powell's comments made Moberly uncomfortable, and she told Powell as much once or twice.  The court finds that Powell's comments fall within the meaning of "unwelcome harassment in the form of sexual advances" for the purposes of establishing a prima facie case of quid pro quo harassment in that Powell's comments can be construed as sexual advances, and Moberly neither solicited nor invited them.  Moberly considered Powell's comments to be undesirable and communicated her feelings to Powell on at least one occasion.  Thus, Moberly has provided sufficient evidence to satisfy the second element of the prima facie case of quid pro quo sexual harassment.

With respect to the third element, that the harassment was based on sex, Moberly "must . . . prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted 'discrimina[tion] . . . because of . . . sex.' "  See Scusa, 181 F.3d at 964 (quoting Oncale v. Sundowner Offshore Serv., Inc., 523 U.S. 75, 81 (1998)).  "[S]exual behavior

directed at a woman raises the inference that the harassment is based on her sex." Burns v. McGregor Elec. Indus., Inc., 955 F.2d 559, 564 (8th Cir. 1992). Here, Powell's comments to Moberly constituted sexual behavior, raising the inference that the harassment was based on Moberly's sex.

Midcontinent alleges that Powell's conduct was not based on Moberly's sex, but rather was based on Moberly's status as a former romantic partner. In some cases involving failed workplace relationships, the former romantic partner's conduct toward the plaintiff, which might otherwise be considered actionable harassment, is properly found to be based on contempt or hurt feelings resulting from the failed relationship rather than based on the plaintiff's sex. See, e.g., Succar v. Dade County Sch. Bd., 229 F.3d 1343, 1345 (11th Cir. 2000) (finding that harassment by coworker was not motivated by the plaintiff's gender, but rather by the coworker's contempt for the plaintiff following their failed relationship); see also Tenge v. Phillips Modern Ag Co., 446 F.3d 903, 909 (8th Cir. 2006) (holding that termination based on employee's consensual sexual conduct with employer or supervisor does not amount to discrimination on the basis of the employee's status as a man or a woman, but rather is based on the employee's own actions and therefore is permissible under Title VII). But the Eighth Circuit has not adopted a bright line rule that harassing conduct in such a situation is presumed or automatically found to be caused by the plaintiff's former romantic involvement

with the alleged harasser rather than the plaintiff's sex. <u>See</u> <u>Newton v. Cadwell</u> <u>Labs.</u>, 156 F.3d 880, 883 (8th Cir. 1998) (holding, without mentioning special rule for causation, that employee who terminated consensual affair with supervisor may have a claim for hostile work environment sexual harassment based on supervisor's post-breakup conduct). The court concludes that the inference raised by Powell's sexual behavior directed at Moberly is sufficient for Moberly to establish that the harassment was based on her sex for the purposes of the third element of the prima facie case of quid pro quo sexual harassment. Whether Powell's behavior was based on Moberly's sex, Moberly's status as a former romantic partner, or some other factor is a question of fact for the jury.

Finally, with respect to the fourth element, that Moberly's submission to the unwelcome advances was an express or implied condition for receiving job benefits or her refusal to submit resulted in a tangible job detriment, the evidence is sufficient to create an inference that Moberly's refusal to submit to Powell's advances after the November 2006 business trip resulted in the denial of a bonus and the termination of her employment. Although Powell did not expressly threaten Moberly with adverse action if she did not respond favorably to his advances, it is undisputed that he made such advances in December 2006, and she was denied a bonus in February 2007 and terminated later that month or early in March 2007. Powell was involved in both decisions, and both

decisions were at least a little bit surprising to Carolan, who recommended disciplinary action in the first place. Moreover, Powell indicated on the termination form that the reason for Moberly's termination was "continuous and ongoing challenges [with] management." This statement is sufficiently broad and vague that it could be found to include continuous and ongoing challenges in Moberly's personal interactions with Powell, including her rejection of his advances. Taken in the light most favorable to Moberly, the evidence sufficiently establishes that Moberly's submission to Powell's unwelcome advances was an implied condition for receiving job benefits or that her refusal to submit to his advances resulted in the denial of a bonus and the termination of her employment. Moberly has provided sufficient evidence to establish all four elements of the prima facie case of quid pro quo sexual harassment. Thus, the burden shifts to Midcontinent to articulate a legitimate, nondiscriminatory reason for its employment decisions.

Midcontinent contends that Moberly received a disciplinary warning for displaying favoritism toward certain account executives on December 4, 2006, that Carolan indicated continuing problems with favoritism on Moberly's December 19, 2006, performance evaluation, and that Moberly failed to timely provide weekly reports of her appointments with account executives in violation of the goals set out in her performance evaluation. Midcontinent also states that employees with unsatisfactory performance evaluations are not eligible for

a bonus.  The court finds that Midcontinent has produced sufficient evidence of a legitimate, nondiscriminatory reason for both the denial of a bonus and termination of Moberly's employment to shift the burden back to Moberly to show that Midcontinent's stated reason for these actions is a mere pretext for discrimination.

Moberly must present sufficient evidence for a reasonable jury to conclude that she was denied a bonus and terminated because of unlawful discrimination.  See St. Mary's Honor Center v. Hicks, 509 U.S. at 507. Drawing all reasonable inferences in favor of Moberly, there is evidence that no one at Midcontinent documented any performance problems regarding Moberly before she rejected Powell's advances after the November 2006 trip to Minneapolis, that Powell reviewed and approved of the negative performance evaluation, that Powell determined that Moberly was not eligible to receive a bonus, that Powell drafted the termination form, that the termination form stated that the reason for the termination was "continuous and ongoing challenges [with] management," that the termination form did not reflect any of the performance issues noted in the written warning and Moberly's performance review, and that Carolan, who recommended that Moberly be terminated for lack of improvement in performance, was a little bit surprised at how Powell drafted the form.  Further, the stated reason for the termination may be construed to include challenges in Moberly's personal interactions with

Powell.  These facts are sufficient for the jury to discredit Midcontinent's stated

reasons for the denial of a bonus and termination of Moberly's employment and

to conclude that Moberly's refusal to submit to Powell's advances after their

November 2006 conversation resulted in Powell's decision to take these actions.

Cf. Gilooly v. Missouri Dep't of Health and Senior Servs., 421 F.3d 734, 740-41

(8th Cir. 2005) (finding that employer had not shown legitimate and

nonretaliatory reason for discharge where employer's written reasons for the

discharge were broad enough to include conduct within the scope of the

employee's protected activity).

    Midcontinent argues that even if Moberly has set forth an actionable

claim of sexual harassment, Midcontinent is not liable under the

Ellerth/Faragher defense.  In Ellerth, 524 U.S. at 765, and Faragher v. City of

Boca Raton, 524 U.S. 775, 807 (1998), the Supreme Court held that when a

supervisor's sexual harassment of an employee results in a tangible

employment action such as discharge, demotion, or undesirable reassignment,

the employer is vicariously liable to the employee.  See also Newton, 156 F.3d

at 883.  But in cases where no tangible employment action is taken, the

employer can avoid vicarious liability by demonstrating that (1) the employer

exercised reasonable care to prevent and correct promptly any sexually

harassing behavior, and (2) the plaintiff unreasonably failed to take advantage

of any preventive or corrective opportunities provided by the employer or to

otherwise avoid harm.  <u>Brenneman v. Famous Dave's of America</u>, 507 F.3d 1139, 1144-45 (8th Cir. 2007).  "The <u>Ellerth</u>/<u>Faragher</u> rule is clear: 'No affirmative defense is available . . . when the supervisor's harassment culminates in a tangible employment action.' " <u>Ogden</u>, 214 F.3d at 1007 (quoting <u>Ellerth</u>, 524 U.S. at 764-65; <u>Faragher</u>, 524 U.S. at 807-08).  Here, Powell's sexual advances culminated in the termination of Moberly's employment, which is clearly a tangible employment action.  Thus, Midcontinent cannot assert the <u>Ellerth</u>/<u>Faragher</u> defense to avoid vicarious liability for Powell's quid pro quo harassment of Moberly.  Midcontinent's motion for summary judgment on this claim is denied.

**B.      Hostile Work Environment Sexual Harassment**

Sexual harassment that does not result in a tangible employment action but that creates a hostile or abusive working environment also violates Title VII.  <u>Brenneman</u>, 507 F.3d at 1143.  Unlike quid pro quo harassment, hostile work environment harassment only violates Title VII if the offensive conduct was "severe or pervasive."  <u>See</u> <u>Henthorn</u>, 359 F.3d at 1026-27.  It is undisputed that the standard for supervisor sexual harassment applies to Moberly's allegation of hostile work environment sexual harassment by Powell.

> In order to make a prima facie case for hostile working
> environment based on supervisor sexual harassment, the plaintiff
> must show that: (1) she belongs to a protected group; (2) she was
> subject to unwelcome harassment; (3) a causal nexus exists
> between the harassment and plaintiff's protected group status; and

(4) the harassment affected a term, condition, or privilege of her employment.

Brenneman, 507 F.3d at 1143   Assuming without deciding that Moberly has provided sufficient evidence to establish the first three elements of her prima facie case, the court finds that Midcontinent is entitled to judgment as a matter of law on Moberly's hostile work environment sexual harassment claim because Moberly has failed to present sufficient evidence of the fourth element of the prima facie case.

The fourth element, that Powell's harassment affected a term, condition, or privilege of Moberly's employment, sets a high threshold.  Sutherland v. Missouri Dep't of Corr., 580 F.3d 748, 751 (8th Cir. 2009).  Moberly must show that "the workplace [was] permeated with discriminatory intimidation, ridicule, and insult."  Id. (internal quotation omitted).  "The harassment must be so severe or pervasive that it alters the employment conditions."  Id.  The conduct must not be "merely rude or unpleasant," but rather must be "so intimidating, offensive, or hostile that it poisoned the work environment."  Gilooly, 421 F.3d at 738 (internal quotations omitted).  "A sexually objectionable environment must be both subjectively and objectively offensive."  Sutherland, 580 F.3d at 751.  The court should consider the totality of the circumstances to determine if the workplace environment was sufficiently hostile.  Id.  Among the factors the court should consider are "the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive

utterance; and whether it unreasonably interferes with an employee's work performance.' " Scusa, 181 F.3d at 967 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)).

Here, taking the evidence in the light most favorable to Moberly, Powell made multiple comments that he was attracted to her and two comments that he wished he could spend all day in her office. All of these comments took place in December 2006. These comments made Moberly uncomfortable, and she told Powell as much once or twice. Powell did not touch Moberly. Considering the infrequency of Powell's comments, the nonthreatening nature of the comments, the lack of physical contact or threats, and the lack of evidence that Powell's comments interfered with Moberly's ability to do her work, the court finds that Powell's conduct does not rise to the level of being so intimidating, so offensive, or so hostile that it poisoned the work environment. See Gilooly, 421 F.3d at 738. Under these facts, Powell's occasional verbal efforts to recapture Moberly's affections do not support a hostile work environment claim. See Cram, 49 F.3d at 474-75 (holding that foreman's efforts to rekindle relationship with plaintiff by changing plaintiff's radio station and asking her to listen for certain songs related to their relationship and leaving three notes on her car were not severe and pervasive in absence of physical contact, inappropriate language, or sexual or intimidating comments); see also Gilooly, 421 F.3d at 738 (finding no severe or pervasive harassment

where coworkers frequently visited plaintiff's desk and stated they were attracted to plaintiff and visited plaintiff's home unannounced).  While Powell's workplace comments may have been unprofessional and insensitive, "more than a few isolated incidents are required" to establish a prima facie case of hostile work environment sexual harassment.  See Scusa, 181 F.3d at 967 (internal quotation omitted).

The Eighth Circuit has found that supervisor conduct that was more severe, sustained, and offensive than Powell's conduct in this case did not rise to the level of actionable conduct for a hostile work environment claim.  In Anderson v. Family Dollar Stores of Arkansas, 579 F.3d 858, 862 (8th Cir. 2009), the plaintiff's supervisor rubbed the plaintiff's back or shoulders at times during a training session, called the plaintiff, "baby doll," accused the plaintiff of not wanting to be "one of [his] girls," suggested that the plaintiff should be in bed with him and a Mai Tai over the phone, and insinuated that the plaintiff could go further in the company if she got along with him.  The Eighth Circuit held that this conduct "simply [was] not severe, pervasive or demeaning enough to have altered a term, condition, or privilege of her employment."  Id. (internal quotation omitted).  The Eighth Circuit reasoned, "[w]hile [the supervisor's] ungentlemanly conduct was decidedly inappropriate, 'Title VII does not prohibit all verbal or physical harassment in the workplace

and is not a general civility code for the American workplace.' " Id. at 862-63

(quoting Hervey v. County of Koochiching, 527 F.3d 711, 722 (8th Cir. 2008)).

Here, Powell's conduct was less severe than the supervisor's conduct in

Anderson. Unlike the supervisor in Anderson, Powell did not touch Moberly,

suggest that she be "one of his girls," or suggest that Moberly should be in his

bed with him. Thus, Anderson supports the court's conclusion that Powell's

comments to Moberly that he was attracted to her and wished he could spend

all day in her office do not rise to the level of actionable harassment. See also

Duncan v. General Motors Corp., 300 F.3d 928, 931-32, 935 (8th Cir. 2002)

(finding no actionable sexual harassment where coworker requested that

plaintiff have a relationship with him, briefly touched plaintiff's hand four or

five times, asked plaintiff to draw a planter shaped like a slouched man with a

hole in front of the man's pants that allowed for a cactus to protrude, created a

"recruitment" poster portraying plaintiff as the president and CEO of the "Man

Hater's Club of America," and asked plaintiff to type a draft of the beliefs of the

"He-Men Women Hater's Club").

Overall, Powell's conduct does not meet the high standard of permeating

the workplace with "discriminatory intimidation, ridicule, and insult" to the

point of altering the employment conditions. Because Moberly has not

produced evidence to show actionable harm, the court concludes that she has

not met her burden of proving a prima facie case of hostile work environment

sexual harassment. As a result, the court need not determine whether Midcontinent can articulate a legitimate, nondiscriminatory reason for Powell's conduct under the second stage of the <u>McDonnell Douglas</u> burden-shifting analysis or whether Midcontinent is vicariously liable for Powell's conduct or entitled to the <u>Ellerth</u>/<u>Faragher</u> defense. In the absence of any disputed material facts relevant to Moberly's hostile work environment claim, Midcontinent is entitled to judgment as a matter of law on this claim.

## II.    Retaliation

Moberly also claims that Midcontinent unlawfully retaliated against her for opposing an unlawful employment practice. Title VII prohibits an employer from retaliating against an employee because the employee has "opposed any practice made an unlawful employment practice by" Title VII or "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e-3(a). To prevail on her retaliation claim, Moberly must establish a prima facie case showing "(1) she engaged in a protected activity; (2) a reasonable person would have perceived the alleged retaliatory action materially adverse; and (3) this adverse action was causally linked to her protected conduct." <u>Sutherland</u>, 580 F.3d at 752. If Moberly can establish her prima facie case, a legal presumption of unlawful discrimination arises and the burden shifts to Midcontinent to "produce evidence of a legitimate, nondiscriminatory reason for [the retaliatory

action]." Stuart, 217 F.3d at 634. If Midcontinent carries this burden, the legal presumption of unlawful discrimination "drops out of the picture," and Moberly must show that Midcontinent's stated reason for the retaliatory action is false and that discrimination was the real reason. Id.

Here, Moberly asserts two instances of protected conduct: first, that she told Powell that his advances made her uncomfortable, and second, that she complained to Powell about Carolan's workplace affair with Jerzak. The court will consider each alleged protected activity separately.

### A. Statement That Powell's Advances Made Moberly Uncomfortable

Moberly alleges that Midcontinent retaliated against her by issuing a written warning, issuing a negative performance evaluation, denying her a bonus, and terminating her employment because she told Powell that his comments that he found her attractive made her uncomfortable. With respect to the first element of Moberly's prima facie case, engagement in a protected activity, Title VII protects two types of activity: first, opposition to discrimination and second, a charge, testimony, assistance, or participation in an investigation, proceeding, or hearing under Title VII. 42 U.S.C. § 2000e-3(a). It is undisputed that Moberly did not bring a charge of discrimination or otherwise participate in a proceeding involving a charge of discrimination before she was terminated from Midcontinent. Thus, her alleged protected conduct must fall under the "opposition" prong. The Eighth

Circuit has held that an employee may be found to have engaged in protected opposition when she tells her supervisor to stop offensive conduct. <u>Ogden</u>, 214 F.3d at 1007. Moreover, an employee need not establish that the conduct she opposed was in fact discriminatory, but rather must demonstrate "a good faith, reasonable belief that the underlying conduct violated the law." <u>Stuart</u>, 217 F.3d at 634. The court finds that Moberly has presented evidence that, taken in the light most favorable to Moberly, shows that she opposed Powell's conduct by telling him that his comments made her uncomfortable. Moreover, there is evidence that Moberly believed that Powell's conduct was inappropriate after their November 2006 discussion, and that her belief was in good faith. Finally, although the court finds that Powell's conduct did not rise to the level of actionable harassment under the exacting standard for hostile work environment sexual harassment, the court finds that it was reasonable for Moberly to believe that Powell's conduct constituted unlawful sexual harassment in light of their disparate positions within Midcontinent. <u>See Meritor</u>, 477 U.S. at 76-77 (Marshall, J., concurring) ("[I]t is precisely because the supervisor is understood to be clothed with the employer's authority that he is able to impose unwelcome sexual conduct on subordinates.").

With respect to the second element, a materially adverse retaliatory action, Moberly must show that the adverse action "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." <u>See</u>

Littleton v. Pilot Travel Centers, LLC, 568 F.3d 641, 644 (8th Cir. 2009).  The action must produce some injury or harm.  Id.  Under this standard, the written warning and negative performance evaluation do not qualify as materially adverse retaliatory actions.  See Sutherland, 580 F.3d at 752 ("A lower satisfactory evaluation, by itself, does not provide a material alteration of [plaintiff's] employment and is not actionable.").  But the denial of a bonus and termination did result in injury or harm, and as such, establish the materially adverse retaliatory action element.  See id. (suggesting that loss of pay qualifies as adverse employment action).

Finally, with respect to the third element, a causal link between the protected conduct and the retaliatory action, Moberly must prove that Midcontinent's retaliatory motive played a part in the adverse employment action.  Gilooly, 421 F.3d at 739-40.  "[E]vidence that gives rise to an inference of a retaliatory motive on the part of the employer is sufficient to prove a causal connection."  Id. (internal quotation omitted).  "An inference of a causal connection between a charge of discrimination and termination can be drawn from the timing of the two events, but in general more than a temporal connection is required to present a genuine factual issue on retaliation."  Peterson v. Scott County, 406 F.3d 515, 525 (8th Cir. 2005).

Here, Moberly has presented evidence that she told Powell that his comments made her uncomfortable in December 2006 and that she was denied

a bonus in February 2007 and terminated later that month or early in March 2007.  It is undisputed that Powell was involved in both decisions.  Powell told Moberly and Carolan why Moberly did not receive a bonus, and he approved of Carolan's recommendation to terminate Moberly's employment and drafted the termination form.  Indeed, Powell stated that Moberly was being terminated because of "continuous and ongoing challenges [with] management" in general, rather than because of the specific concerns Carolan had expressed.  Under these facts, the two- to three-month proximity between Moberly's opposition to Powell's comments and the alleged retaliatory actions is sufficient to create an inference that Moberly was denied a bonus and terminated because of her opposition to Powell's conduct.  See Bassett v. City of Minneapolis, 211 F.3d 1097, 1106 (8th Cir. 2000) (finding inference of causation where adverse action taken less than two months after protected action).  While Moberly still must show something more than temporal proximity to establish a factual issue on her retaliation claim as a whole, the court finds the inference created by the timing of the opposition and the retaliatory actions is sufficient for Moberly to establish a prima facie case.  See O'Bryan v. KTIV Television, 64 F.3d 1188, 1193-94 (8th Cir. 1995) (explaining that in some cases temporal proximity may be sufficient to demonstrate a prima facie case).  Thus, the burden shifts to Midcontinent to produce a legitimate reason for denying Moberly a bonus and terminating her employment.

Midcontinent has presented evidence that Moberly received a disciplinary warning for displaying favoritism toward certain account executives on December 4, 2006, that Carolan indicated continuing problems with favoritism on Moberly's December 19, 2006, performance evaluation, and that Moberly failed to timely provide weekly reports of her appointments with account executives in violation of the goals set out in her performance evaluation. Midcontinent also produced evidence that employees with unsatisfactory performance evaluations are not eligible for a bonus. The court finds that Midcontinent has produced sufficient evidence of a legitimate, nondiscriminatory reason for both the denial of a bonus and termination of Moberly's employment to shift the burden back to Moberly to show that Midcontinent's stated reason for these actions is false and that discrimination was the real reason.

Moberly "must present sufficient evidence for a reasonable jury to conclude that her protected conduct was a determinative factor in a materially adverse employment action taken by the employer." See Hervey, 527 F.3d at 722. At this stage, she must show more than a temporal connection between the protected conduct and the adverse employment action to present a genuine factual issue on her retaliation claim. Id. at 723. Drawing all reasonable inferences in favor of Moberly, the evidence shows that nobody at Midcontinent documented any performance problems regarding Moberly before Moberly told

Powell that his comments made her uncomfortable, that Powell reviewed and approved of the negative performance evaluation, that Powell determined that Moberly was not eligible to receive a bonus, that Powell drafted the termination form, that the termination form stated that the reason for termination was "continuous and ongoing challenges [with] management," that the termination form did not reflect any of the performance issues noted in the written warning and Moberly's performance review, and that Carolan, who recommended that Moberly be terminated for lack of improvement in performance, was a little bit surprised at how Powell drafted the form. The reason Powell gave for terminating Moberly, "continuous and ongoing challenges [with] management," can reasonably be construed to encompass Moberly's opposition to Powell's advances. "[T]he reasons for firing must be sufficiently independent from the [protected activity] to constitute legitimate and nonretaliatory reasons for discharge." Gilooly, 421 F.3d at 740 (internal citation omitted). The court finds that Powell's statement on the termination form together with all of the other undisputed facts is sufficient for the jury to discredit Midcontinent's stated reasons for the adverse actions and to conclude that discrimination based on Moberly's opposition to Powell's advances was a determinative factor in Powell's decision to deny her a bonus and terminate her employment. Midcontinent's motion for summary judgment on this claim is denied.

**B.     Rumor of Carolan-Jerzak Affair**

Moberly also claims that she was retaliated against because she told Powell that Carolan and Jerzak were rumored to be having a romantic relationship.  Midcontinent argues that Moberly's complaint to Powell was not protected activity under Title VII.  The court agrees.  As noted, Title VII protects employees from retaliation based on opposition to discrimination and participation in an investigation, proceeding, or hearing under Title VII.  42 U.S.C. § 2000e-3(a).  There is no evidence that Moberly participated in a proceeding arising out of a charge of discrimination related to Carolan's alleged relationship with Jerzak.  Thus, Moberly's complaint must fall under the "opposition prong" to be protected activity under Title VII.

To fall under the "opposition prong," an employee must oppose conduct that she reasonably and in good faith believed was in violation of Title VII. Stuart, 217 F.3d at 623.  Considering first whether Moberly had a good faith belief that the rumored relationship was unlawful under Title VII, there is no evidence that Moberly subjectively believed that Carolan's alleged relationship with Jerzak was nonconsensual, based on harassment, a result of quid pro quo threats, or otherwise unlawful under Title VII.  Taking the evidence in the light most favorable to Moberly, Moberly reported to Powell that there was a rumor among her team that Carolan and Jerzak were romantically involved and that her team was complaining about favoritism arising from this relationship.

Moberly had not heard the rumor herself, and she did not ask Jerzak if the rumor was true. Moberly now asserts that a relationship between a supervisor and an account executive may have violated the Midcontinent sexual harassment policy, but it is undisputed that she did not read the policy before she was terminated and there is no evidence that she held this belief at the time she complained to Powell. There is simply no evidence that Moberly believed that Carolan's treatment of Jerzak was discriminatory or in violation of Title VII. Rather, the undisputed evidence shows that Moberly was concerned that Carolan was engaging in favoritism that negatively affected Moberly's team. This conduct is certainly concerning from a supervisor's perspective, but is not forbidden by Title VII.

Assuming for the sake of argument that Moberly subjectively believed that the conduct she reported to Powell violated the law, this belief was not objectively reasonable. Although reasonableness determinations are usually left to the jury, here, the court concludes as a matter of law that in the absence of any indication of lack of consent or harassing conduct, it is unreasonable for a supervisor who has not read the company sexual harassment policy to rely on second-hand rumors of a workplace relationship to conclude that one employee's conduct in the rumored relationship was in violation of Title VII. It is also unreasonable for the complaining supervisor to assume that any favoritism arising out of the rumored relationship violated federal

antidiscrimination statutes.  It was established at the time of Moberly's complaint to Powell that "absent claims of coercion or widespread sexual favoritism, where an employee engages in consensual sexual conduct with a supervisor and an employment decision is based on this conduct, Title VII is not implicated because any benefits of the relationship are due to the sexual conduct, rather than the gender, of the employee."  <u>Tenge</u>, 446 F.3d at 909.

Taking the evidence in the light most favorable to Moberly, there is no evidence that in reporting the rumored relationship to Powell, Moberly opposed conduct that she reasonably and in good faith believed was in violation of Title VII.  Thus, Moberly's complaint to Powell was not protected activity, and she cannot establish a prima facie case of retaliation.  As a result, Midcontinent is entitled to judgment as a matter of law on this claim.[2]

## CONCLUSION

The court finds that Midcontinent is entitled to judgment in its favor on Moberly's hostile work environment sexual harassment claim and Moberly's retaliation claim arising out of her complaint about the rumored relationship between Carolan and Jerzak.  But Midcontinent is not entitled to summary judgment on Moberly's claim that she suffered an adverse employment action

---

[2] The court need not resolve Midcontinent's claim that Moberly failed to exhaust her administrative remedies with respect to her claim that she was retaliated against because she complained about the rumored relationship to Powell.

as a result of quid pro quo sexual harassment and was retaliated against because she told Powell that his advances made her uncomfortable.

Midcontinent asserts that there is no genuine issue of fact on Moberly's quid pro quo sexual harassment and retaliation claims because it had legitimate reasons to take adverse action against Moberly. Moberly does not deny the factual basis for the written warning or that Midcontinent had reason to be dissatisfied with her performance. And it is well established that "antidiscrimination statutes do not insulate an employee from discipline for violating the employer's rules or disrupting the workplace." Hervey, 527 F.3d at 724. But the facts of this case, particularly that Powell decided whether Moberly was entitled to a bonus, approved the decision to terminate her, and drafted the termination form in a way that surprised the person who recommended termination in the first place, show that there is a factual dispute over the issue of whether these adverse actions were taken because of Moberly's performance problems or because Moberly rejected and opposed Powell's advances. "[W]here motive, intent and credibility are key factors summary judgment is generally inappropriate." Keys v. Lutheran Family & Children's Servs. of Mo., 668 F.2d 356, 358 (8th Cir. 1981). Midcontinent is not entitled to summary judgment on Moberly's quid pro quo sexual harassment claim or Moberly's retaliation claim arising out of her statement to Powell that his comments made her uncomfortable because the evidence may

permit a reasonable jury to conclude that Midcontinent discriminated against

Moberly because she rejected and opposed Powell's advances.

Accordingly, it is hereby

ORDERED that Midcontinent's motion for summary judgment (Docket

14) is granted in part and denied in part.

Dated May 7, 2010.

BY THE COURT:

/s/ *Karen E. Schreier*

KAREN E. SCHREIER
CHIEF JUDGE